**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

| | | |
|---|---|---|
| ROBERT HENSON, | : | |
| | : | Appellate No.: 13-4711 |
| Plaintiff, | : | Civil Action No.: 11-cv-1809 (JBS)(KMW) |
| | : | |
| v. | : | |
| | : | |
| U.S. FOODSERVICE, INC., | : | |
| and JOHN DOES 1-10, | : | |
| | : | |
| Defendants. | : | |

## APPELLANT'S BRIEF

## and

## APPENDIX I of II - PA1-PA41

William Riback, Esquire
The Riback Law Firm
132 N. Haddon Avenue
Haddonfield, NJ 08033
856.857.0008

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................1

II.    JURISDICTION ...........................................................................1

III.    ISSUE PRESENTED ....................................................................2

IV.    RELATED CASES AND PROCEEDINGS....................................2

V.    STATEMENT OF THE CASE ......................................................2

VI.    STATEMENT OF FACTS ...........................................................4

VII.    STANDARD OF REVIEW ..........................................................11

VIII.    LEGAL ARGUMENT .................................................................12

    A.  A reasonable jury could find that Mr. Henson suffered
retaliation under the FMLA. .......................................................12

        1.  Mr. Henson provided *direct evidence* of animus by
decision makers against employees who used FMLA.....................12

        2.  Mr. Henson also has strong circumstantial evidence
which should require a jury to determine the real
reason...........................................................................................15

        3.  USF asserts it terminated Mr. Henson for
insubordination and lack of remorse ...............................................18

        4.  Summary judgment should be reversed because there
is sufficient evidence for a reasonable jury to believe
that the FMLA was a substantial factor in the decision
to terminate his employment.........................................................18

        5.  This court should reverse the summary judgment
against Mr. Henson because his supervisor, the Night
Manager, routinely engaged in ridiculing African-
American employees ......................................................................25

IX.    CONCLUSION.............................................................................28

APPENDIX I OF II (attached to brief)

Notice of Appeal ........................................................................................................PA1
Order on Summary Judgment ..................................................................................PA2
Opinion Granting Summary Judgment....................................................................PA3

APPENDIX II OF II

Docket Report for Case No: 1.11-cv-01809-JBS-KMW ....................................PA42
U.S. Food's Statement of Facts ..............................................................................PA51
Declaration of Guy G. Brenner ..............................................................................PA64
Exhibit A to Declaration of Guy G. Brenner  ......................................................PA68
Exhibit B to Declaration of Guy G. Brenner .......................................................PA81
Exhibit C to Declaration of Guy G. Brenner .....................................................PA112
Exhibit D to Declaration of Guy G. Brenner  ....................................................PA115
Exhibit E to Declaration of Guy G. Brenner  .....................................................PA125
Exhibit F to Declaration of Guy G. Brenner  .....................................................PA129
Exhibit G to Declaration of Guy G. Brenner  .....................................................PA133
Declaration of Robert Lebb....................................................................................PA140
Exhibit A to Declaration of Robert Lebb..............................................................PA149
Exhibit B to Declaration of Robert Lebb ..............................................................PA196
Exhibit C to Declaration of Robert Lebb..............................................................PA201
Exhibit D to Declaration of Robert Lebb..............................................................PA203
Exhibit E to Declaration of Robert Lebb ..............................................................PA205
Exhibit F to Declaration of Robert Lebb ..............................................................PA207
Exhibit G to Declaration of Robert Lebb..............................................................PA209
Exhibit H to Declaration of Robert Lebb..............................................................PA212
Exhibit F to Declaration of Robert Lebb ..............................................................PA214
Exhibit J to Declaration of Robert Lebb ..............................................................PA216
Exhibit K to Declaration of Robert Lebb..............................................................PA218
Exhibit L to Declaration of Robert Lebb ..............................................................PA220
Exhibit M to Declaration of Robert Lebb .............................................................PA222
Exhibit N to Declaration of Robert Lebb ..............................................................PA224
Exhibit O to Declaration of Robert Lebb..............................................................PA226
Exhibit P to Declaration of Robert Lebb ..............................................................PA228
Exhibit Q to Declaration of Robert Lebb .............................................................PA230
Exhibit R to Declaration of Robert Lebb..............................................................PA232
Exhibit S to Declaration of Robert Lebb...............................................................PA234
Exhibit T to Declaration of Robert Lebb ..............................................................PA236
Exhibit U to Declaration of Robert Lebb..............................................................PA238
Exhibit V to Declaration of Robert Lebb..............................................................PA240
Exhibit W to Declaration of Robert Lebb.............................................................PA242
Exhibit X to Declaration of Robert Lebb..............................................................PA244

Exhibit Y to Declaration of Robert Lebb ................................................................. PA246
Exhibit Z to Declaration of Robert Lebb ................................................................. PA248
Exhibit AA to Declaration of Robert Lebb .............................................................. PA250
Declaration of William Nunan ................................................................................ PA252
Exhibit A to Declaration of William Nunan ............................................................ PA256
Exhibit B to Declaration of William Nunan ............................................................ PA305
Exhibit C to Declaration of William Nunan ............................................................ PA307
Exhibit D to Declaration of William Nunan ............................................................ PA334
Exhibit E to Declaration of William Nunan ............................................................ PA336
Exhibit F to Declaration of William Nunan ............................................................. PA338
Exhibit G to Declaration of William Nunan ............................................................ PA340
Henson's Response to U.S. Food's Statement of Facts ............................................ PA342
Henson's Counter-Statement of Facts ..................................................................... PA348
Certification of William Riback, Esq. ..................................................................... PA359
Exhibit A to Certification of William Riback, Esq .................................................. PA362
Exhibit B to Certification of William Riback, Esq .................................................. PA366
Exhibit C to Certification of William Riback, Esq .................................................. PA367
Exhibit D to Certification of William Riback, Esq .................................................. PA382
Exhibit E to Certification of William Riback, Esq .................................................. PA387
Exhibit F to Certification of William Riback, Esq .................................................. PA401
Exhibit G to Certification of William Riback, Esq .................................................. PA416
Exhibit H to Certification of William Riback, Esq .................................................. PA421
Exhibit I to Certification of William Riback, Esq ................................................... PA428
Exhibit J to Certification of William Riback, Esq ................................................... PA445
Exhibit K to Certification of William Riback, Esq .................................................. PA461
Exhibit L to Certification of William Riback, Esq .................................................. PA469
Exhibit M to Certification of William Riback, Esq ................................................. PA472
Exhibit N to Certification of William Riback, Esq .................................................. PA487
Exhibit O to Certification of William Riback, Esq .................................................. PA537
Exhibit P to Certification of William Riback, Esq .................................................. PA440
Exhibit Q to Certification of William Riback, Esq .................................................. PA541
Exhibit R to Certification of William Riback, Esq .................................................. PA544
Exhibit S to Certification of William Riback, Esq .................................................. PA547
Exhibit T to Certification of William Riback, Esq .................................................. PA550
Exhibit U to Certification of William Riback, Esq .................................................. PA552
U.S. Food's Response to Henson's Counter-Statement of Facts ................................ PA555
Exhibit A to U.S. Food's Response to Henson's Counter-Statement of Facts ........... PA577
Exhibit B to U.S. Food's Response to Henson's Counter-Statement of Facts ........... PA586
Exhibit C to U.S. Food's Response to Henson's Counter-Statement of Facts ........... PA590
Exhibit D to U.S. Food's Response to Henson's Counter-Statement of Facts ........... PA593
Exhibit E to U.S. Food's Response to Henson's Counter-Statement of Facts ........... PA596
Exhibit F to U.S. Food's Response to Henson's Counter-Statement of Facts ........... PA604
Exhibit G to U.S. Food's Response to Henson's Counter-Statement of Facts ........... PA611

Exhibit H to U.S. Food's Response to Henson's Counter-Statement of Facts ............ PA623
Exhibit I to U.S. Food's Response to Henson's Counter-Statement of Facts ............. PA628
Exhibit J to U.S. Food's Response to Henson's Counter-Statement of Facts ............. PA631
Exhibit K to U.S. Food's Response to Henson's Counter-Statement of Facts ............. PA644
Letter from Alnisa Bell, Esq. ...................................................................................... PA648
Exhibit A to Letter from Alnisa Bell, Esq. ................................................................. PA649
Exhibit B to Letter from Alnisa Bell, Esq. ................................................................. PA652

# TABLE OF AUTHORITIES

**Case Law:**

*Bearley v. Friendly Ice Cream Corp.,*
322 F. Supp. 2d 563 (M.D. Pa. 2004)........................................................18

*Burnett v. LFW, Inc.,*
472 F.3d 471 (7th Cir. 2006). ......................................................................18

*Chevron U.S.A., Inc. v. Natural Resources Defense Council,*
467 U.S. 837 (1984)........................................................................................14

*Conoshenti v. Public Service Electric & Gas Company,*
364 F.3d 135 (3d Cir. 2004). .........................................................................15

*Fakete v. Aetna Inc.,*
308 F.3d, 335 (3d Cir. 2002). ........................................................................12

*Farrell v. Planters Lifesavers Co.,*
206 F.3d 271 (3d Cir. 2000). .........................................................................17

*Fuentes v. Perskie,*
32 F.3d 759 (3d Cir. 1994). .....................................................................18, 19

*Harville v. Texas A&M Univ.,*
833 F. Supp. 2d 645 (S.D. Tex. 2011) .........................................................14

*Hunter v. Valley View Local Schools,*
579 F.3d 688 (6th Cir. 2009). .......................................................................14

*Jalil v. Avdel Corp.,*
873 F.2d 701 (3d Cir.1989). ..........................................................................15

*Jalil v. Avdel Corp.,*
 493 U.S. 1023, (1990). ...................................................................................15

*Kachmar v. SunGard Dadt. Sys.,*
109 F.3d 173 (3d Cir. 1997). .........................................................................17

*LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n,*
503 F.3d 217 (3d Cir. 2007). .........................................................................17

*Lewis v. School Dist. #70,*
523 F.3d 730 (7th Cir. 2008). ..................................................................18

*Liechtenstein v. University of Pittsburgh,*
691 F.3d 294 (3rd Cir 2012). ..................................................................14

*Marra v. Philadelphia Housing Authority,*
497 F.3d 286, 308 (3d Cir. 2010) ..........................................................17

*Massarsky v. Gen. Motors Corp.,*
706 F.2d 111 (3d Cir. 1983). .................................................................15

*Massarsky v. Gen. Motors Corp*
464 *U.S.* 937 (1983) ................................................................................15

*McKenna v. Pac. Rail Serv.,*
32 F.3d 820 (3d Cir. 1994). ....................................................................15

*Naber v. Dover Healthcare Associates, Inc.,*
473 F. App'x 157 (3d Cir. 2012). ............................................................18

*O'Hare v. McLean Packaging and Trucking,*
2009 WL 3207277 (D.N.J. 2009) ............................................................17

*Opsatnik v. Norfolk S. Corp.,*
335 F. App'x 200 (3d Cir. 2009) ........................................................22, 23

*Palen v. Alcan Packaging,*
511 F. Supp. 2d 445 (D.N.J. 2007). ........................................................17

*Parker v. Hahnamann University Hosp.,*
234 F. Supp. 2d 478 (D.N.J. 2002). ........................................................14

*Price Waterhouse v. Hopkins,*
490 U.S. 228 (1989) ................................................................................14

*Sempier v. Johnson & Higgins,*
45 F.3d 724 (3d Cir. 1995). .....................................................................15

*Sempier v. Johnson & Higgins,*
515 *U.S.* 1159, (1995). .............................................................................15

*Simpson v. Kay Jewelers, Division of Sterling, Inc.*,
142 F.3d 639 (3d Cir. 1998). ............................................................18, 24

*Spring v. Sealed Air Corporation*,
483 Fed. Appx. 765, (3d Cir. 2012). ..........................................................14

*Sprint/United Mgmt. Co. v. Mendelsohn*,
552 U.S. 379 (2008). ...................................................................................23

*Texas Dep't of Cmty. Affairs v. Burdine*,
450 U.S. 248 (1981). ...................................................................................15

*Torre v. Casio, Inc.*,
42 F.3d 825 (3d Cir. 1994). ........................................................................15

*Weldon v. Kraft, Inc.*,
896 F.2d 793 (3d Cir.1990). ........................................................................15

*Wilcher v. Postmaster Gen.*,
441 F. App'x 879 (3d Cir. 2011). ..........................................................22, 23

*Wright v. Murray Guard, Inc.*,
455 F.3d 702 (6th Cir.2006). .......................................................................23

*Yashenko v. Harrah's NC Casino Co., LLC*,
325 F. Supp 2d 653 (W.D.N.C. 2005). ...................................................16, 17

*Yashenko v. Harrah's NC Casino Co., LLC*
446 F.3d 541 (4th Cir. 2006). ................................................................16, 17

**Statutory Law:**
28 U.S.C. § 1291 ...........................................................................................1

28 U.S.C. § 1331 ...........................................................................................1

28 U.S.C. § 1367 ...........................................................................................1

# I.  PRELIMINARY STATEMENT

Mr. Robert Henson is a Union employee who was on FMLA when he was terminated. Summary judgment on his FMLA retaliation claim should be reversed. The trial court held there was no direct evidence – yet both decision makers routinely expressed disdain at those union employees who would use FMLA. The trial court would not credit Mr. Henson's *prima facie* case even though he was employed there for seven years. The trial court improperly weighed the credibility of the witnesses' testimony in determining Mr. Henson was not insubordinate. The trial court would not recognize Mr. Henson's comparators even though they engaged in similar or worse conduct and permitted to continue working at USF. And the trial court refused to credit Mr. Henson's testimony that he was apologetic

Summary judgment on his NJLAD harassment claim should likewise be reversed. The trial court held there was no harassment claim because Mr. Henson chose to stand pat and have lunch with his friends at a quieter time and location. Yet the Supervisor on a daily basis disparaged African American employees using the most base references to genital size, fried chicken and dancing. This supervisor was the highest ranking person on the night shift and responsible for the overall tone of the facility.

# II. JURISDICTION

This is an appeal from a final judgment that disposes of all parties' claims.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.  The district court had Federal

Question jurisdiction pursuant to 28 U.S.C. § 1331 and Pendant jurisdiction pursuant to 28 U.S.C. § 1367.

On November 19, 2013 the trial court granted summary judgment to USF on Plaintiff's 1) FMLA retaliation  claim, 2) Plaintiff's wrongful termination claim based upon race under the New Jersey Law Against Discrimination (hereinafter NJLAD) and 3) NJLAD hostile work environment claim.  (PA2-41).  Mr. Henson is *not* appealing issue two. On Dec. 16, 2013, within 30 days of the entry of judgment, Mr. Henson noticed his appeal. (PA-1).  Consequently, this appeal is timely.

## III.    ISSUES PRESENTED

A.    Should summary judgment on Plaintiff's FMLA be reversed when: 1) decision makers made hostile and threatening statements to employees who took FMLA; 2) a reasonable jury can find Mr. Henson was not insubordinate but rather failed to follow instructions – not a terminable offense and; 3) other similarly situated employees engaged in similar or worse conduct.

B.    Should summary judgment on Plaintiff's NJLAD harassment claim be reversed when: 1) Plaintiff's supervisor 2) routinely – on a daily basis - had a schtick 3) that embarrassed and humiliated Plaintiff 4) with racially charged statements.

## IV.    RELATED CASES AND PROCEEDINGS

There are no related cases or proceedings before this Court.

# V. STATEMENT OF THE CASE

Mr. Robert Henson was a seven year employee at USF when he was terminated. He was a Laborer on the night shift governed by a Collective Bargaining Agreement. On March 11, 2009 Mr. Henson was approved by USF's Administrator to take qualified intermittent FMLA from February 23, 2009 through July 22, 2009. He was terminated while in the midst of this approved leave period.

USF management disdained the use of FMLA by its union employees. Robb Lebb, Director of Operations, used harsh expletive language at pre-work meetings, demanding those present to call those who were out on qualified leave and get them back to work because those "MFers" are costing the company money. Other managers followed his lead in ridiculing and intimidating the union employees who took FMLA.

Mr. Jack Conway, Mr. Henson's Supervisor referred to the FMLA as the fraudulent medical leave act and workers who took it as "part-timers". Mr. Lebb expressed satisfaction that an employee who was on FMLA was terminated. Mr. Conway advised a person who was out on FMLA that he was subject to being terminated. Employees in desperate need of taking care of seriously ill family members got the message, and stopped taking the FMLA.

On August 26, 2010, Mr. Conway directed Mr. Henson to break down a leaning skid and re-assemble it for shipment. Instead, Mr. Henson returned it to the freezer so employees could pick smaller orders off the skid – in his view precluding the necessity of breaking it down – and returned with a well built skid which was shipped. Mr. Henson was terminated for "insubordination."

Mr. Henson claims that the termination was retaliatory for taking FMLA basing his claim on: 1) direct evidence; 2) testimony that his actions were not insubordination – rather he "failed to follow instruction" – not terminable and; other employees had engaged in similar or worse conduct but were permitted to keep their employment.

Mr. Henson also brought suit under the NJLAD for racial harassment. On a daily basis Jack Conway, Night Manager, would enter the break room with an onslaught of comments and a routine of mimicking his perception of black dancing. His comments referred to genital size and derogatory remarks about perceived black cuisine being fried chicken and *grape soda*. Mr. Henson recounted this occurring on a daily basis, he could not count the number of times, and that he found it offensive. His co-workers who still worked at USF testified to not being offended but could see how others would be. This part of the case was dismissed on what Plaintiff sees as terribly mistaken-anachronistic reasoning: if Mr. Henson was so offended by the comments he should have had lunch somewhere else – apart from his friends and under busier conditions.

## VI.    STATEMENT OF FACTS

1. Mr. Henson began his employment with USF April 4, 2004 at the Swedesboro facility. (PA362-65).

2. On August 31, 2010, Mr. Henson was terminated during a designated FMLA period for his interaction with Jack Conway. (PA366).

3. Mr. Conway alleged that Mr. Henson was insubordinate.

4. Frank Keyser, Warehouse Manager, testified that Mr. Henson's actions were best characterized as failure to follow instructions, meaning not doing something he was instructed to do. (PA377).

5. Mr. Keyser distinguished Mr. Henson's actions from insubordination, explaining that insubordination is a hostile refusal to do work. (PA376).

6. William Anthony, Union Representative, also testified that Mr. Henson's conduct amounted to failure to follow instructions. (PA385).

7. USF alleges Mr. Henson was not contrite.

8. Mr. Henson apologized to Jack Conway and apologized again in the meeting regarding his termination. (PA399).

9. Mr. Henson did not curse at Mr. Conway on the phone. (PA364, 400).

10. Rob Lebb, Director of Operations, was a final decision maker. (PA412).

11. Rob Lebb stepped outside of the grievance meeting with Jack Conway and they decided to terminate Mr. Henson's employment. (PA384-85).

## Jack Conway Lacks Credibility

12. USF terminated[1] Mr. Conway's employment for dishonesty, theft. (PA417-18).

13. USF's own management view Mr. Conway as not credible, labeling him a thief. (PA419-20).

## FMLA Direct Evidence/Ongoing Antagonism

14. At pre-shift meetings, Robert Lebb, Director of Operations, would tell the employees they were working more because of their "FMLA buddies" and

---

[1] The testimony indicates that Jack Conway was permitted to resign in lieu of termination. (Nunan Dep. at 102:12-16, 103:9-16, 20-21). The semantical distinctions are not important.

encouraged employees to call those out on FMLA, to tell them to come to work. (PA425).

15. Mr. Lebb's disdain toward FMLA is illustrated by his use of pejoratives toward those who dared take FMLA "these *motherfuckers* on FMLA [were] the reason [employees were] working… overtime."  (PA429).

16. Mr. Lebb specifically referred to USF needing to expend resources for overtime because employees were utilizing FMLA. (PA430).

17. USF published a list at both facilities of the employees who were taking FMLA on the wall so there was no mistake to whom Mr. Lebb was specifically referring. (PA446-49, 462-64).

18. Management at the Bridgeport facility made a point to inform employees that Joseph Neal[2] was on FMLA leave. (PA470).

19. In the pre-shift meetings, Mr. Lebb, Director of Operations, Craig Fowler, Day Warehouse Manager, and Tim Hiddleman, Manager/Supervisor, would address the issue of people calling out, complain about people taking FMLA days, and make other comments. (PA446, 449, 455).

20. Mr. Neal testified that when he returned from FMLA leave people would accuse him of going to Disney World. (PA446).

21. Mr. Lebb would also make comments when Mr. Neal returned to work. (PA449).

22. Mr. Lebb also expressed that he was glad an employee was fired because the employee was on FMLA. (PA450).

---

[2] Mr. Neal also brought a lawsuit against USF for FMLA Interference/Retaliation. (Docket Entry # 1:11-cv-02081-JBS-AMD).

23. It is undisputed that Jack Conway, Night Manager, would routinely refer to the FMLA as the "fraudulent medical leave act." (PA368-69, 374-75, 472-86).

24. Mr. Conway would directly refer to persons who took FMLA as "part-timers." (PA477-79).

25. Mr. Henson also heard Mr. Conway refer to FMLA as the "fraudulent medical leave act" when Mr. Conway told Dorien Wilson and Carl Richman that they were on the "fraudulent medical leave act."  (PA388-89).

26. On several occasions Nate Halmon had disagreements with Mr. Conway where he told Mr. Conway he had FMLA for a family member and Mr. Conway responded that it did not matter and he (Mr. Halmon) should have been at work. (PA490-91).

27. An employee named Pete had his job threatened when he took FMLA leave. (PA421-27).

<u>Comparator Evidence</u>

28. The stated reason for Mr. Henson's termination was for insubordination and lack of remorse.

29. On February 28, 2008, Kareem Anthony failed to follow instructions precisely what Mr. Henson did, but only received a verbal warning. (PA505).

30. On October 20, 2009, Mr. Anthony was terminated for dishonesty and falsifying company documents. (PA491).

31. On November 29, 2009, Mr. Anthony was reinstated despite his dishonesty. (PA492).

32. As part of the reinstatement agreement, Kareem Anthony could be terminated without resort to arbitration and the termination was reduced to an unpaid suspension. (PA492).

33. On September 7, 2011, Mr. Anthony was again suspended for dishonesty. (PA500).

34. Dishonesty and theft are terminable offenses.

35. Rob Lebb is the decision maker. (PA 412, 491,492, 500).

36. Christopher Lawson[3] (Caucasian, non-FMLA) was insubordinate. (PA381).

37. Bob Bergen, Supervisor, gave Mr. Lawson a work order. (PA386).

38. Mr. Lawson gave the order back to Mr. Bergen, and said he did not want to do it, and told the supervisor to give the order to someone else. (PA386).

39. As a result of Mr. Lawson's refusal, the supervisor gave the work order to another employee, Scott Gallagher. (PA404, 538).

40. At the time Mr. Lawson committed insubordination he had the lowest seniority on the shift. (PA539).

41. Bob Bergen reported the incident to Rob Lebb. (PA386).

42. Mr. Lawson, though, was only suspended and was permitted to keep his job. (PA404, 412).

43. Terrance Turpin, a non-FMLA, Caucasian employee, was delegated work by a supervisor. (PA409).

---

[3] In addition to insubordination, Christopher Lawson had a string of other infractions but was permitted to keep his job. These infractions include: three to four unexcused absences (Lawson Dep. at 21:10-18), being late twice (*Id.* at 22:13-17), multiple mispick errors (*Id.* at 23:16-23), and an incident where he was "messing around" with another employee (*Id.* at 24:1-8).

8

44. In response, Terrance Turpin told the supervisor, "Fuck you, I'm not doing it." (PA409).

45. Mr. Turpin was charged with insubordination. Mr. Turpin was given notice of his termination, however, unlike Mr. Henson, he was permitted to return to work at USF. (PA408).

<u>Discrimination Against FMLA Employees</u>

46. Harold Hall testified that he experienced discrimination because he was taking FMLA leave. (PA481).

47. He testified that on multiple occasions he heard Jack Conway refer to employees on FMLA as "part-timers." (PA477-79).

48. Mr. Conway told Mr. Hall that he (Mr. Conway) could fire him. (PA472-486).

49. Mr. Hall ceased taking FMLA leave, despite needing to care for his seriously ill relative.[4] (PA472-486).

50. Mr. Hall testified that after he began taking FMLA leave he began receiving unwarranted production write-ups, including write-ups for mispicks. (PA481-83, 486).

51. Paul Arrera was also disciplined for absences, including written warnings, when he took FMLA leave. (PA542).

52. Joseph Neal, an employee on FMLA was disciplined several times for absenteeism, despite informing management of his FMLA status. (PA544-45).

53. Tim Hiddleman, Manager/Supervisor, disciplined Mr. Neal for his FMLA attendance. (PA446-48).

---

[4] Harold Hall's deposition has been marked confidential. To protect his privacy and the privacy of his relative, Mr. Henson will not discuss the details of the condition in this brief.

54. Mr. Neal also was denied leave. (PA458).

## Hostile Work Environment

55. Jack Conway, Manager, made multiple comments referring to the size of African-American men's genitalia. (PA427, 437-39, 473-74).

56. Mr. Conway would provide his imitation of how African-American's danced including physical gestures. (PA434-39).

57. Jack Conway would also refer to African-American employees as "brothers." (PA475).

58. A group of African-American employees would typically eat lunch together in the break room.

59. Jack Conway would routinely refer to the employees as the "BET lunch." (PA393-95).

60. Mr. Conway would ask the employees if they were eating chicken and grape soda. (PA390).

61. Jack Conway would also tell the African-American employees derogatory stories about his African-American stepchildren. (PA396).

62. The comments were directed at a group of people that included Mr. Henson and were made in Mr. Henson's presence. (PA548).

63. The comments were so frequent, nearly every day, and offensive that Mr. Henson had no choice but to try to block out Mr. Conway's comments and try to tune Mr. Conway out. (PA392, 397, 398).

64. It got to the point where Jack Conway made so many comments that Mr. Henson stopped counting. (PA391).

65. Carl Richmond testified that he could see how Jack Conway's comments could offend people. (PA549).

66. Mr. Henson testified that it was as though there were two different sets of rules. (PA363).

67. Four employees would come back from break late and only one, the African-American employee, would be sent home. (PA363-64).

68. Two employees that drove to work together, Kevin (Caucasian) and James (African-American) were both having mispick problems. (PA365).

69. Only James, the African-American employee, was disciplined. (PA365).

70. Jack Conway had authority to recommend discipline including termination decisions. (PA370-71).

71. Jack Conway was involved in disciplinary hearings. (PA380).

72. Jack Conway recommended and was instrumental in Mr. Henson's termination. (PA384-85) (Exhibit D); (PA371-72, 375).

73. Other supervisors report to Jack Conway. (PA375).


## VII.   STANDARD OF REVIEW

The District Court's decision is reviewed *de novo,* applying the same standard as the District Court. *Doe v. Luzerne Cnty.*, 660 F.3d 169, 174 (3d Cir. 2011). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might

affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The record is reviewed in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 535 (3d Cir. 2007). "In performing this narrow inquiry, [trial courts and appellate courts] must refrain from weighing the evidence, determining the credibility of witnesses, or substituting [their] own version of the facts for that of the jury." *Marra v. Phila. Hous. Auth.,* 497 F.3d 286, 300 (3d Cir. 2007). A motion for summary judgment is properly denied if "a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252.

## VIII. LEGAL ARGUMENT

### A.  A reasonable jury could find that Mr. Henson suffered retaliation under the FMLA.

#### 1. Mr. Henson provided *direct evidence* of animus by decision makers against employees who used FMLA.

Direct evidence are decision maker statements showing unlawful bias along with a rational presumption that these statement would be acted upon in the decision making process. *Fakete v. Aetna Inc.*, 308 F.3d 335, 337-39 (3d Cir. 2002).  Despite the trial court holding otherwise, Mr. Henson produced a plethora of evidence that Jack Conway, Night Manager, *and* Robb Lebb, Director of Operations, routinely threatened or degraded employees who took FMLA:

- The identity of those out on FMLA were hung up on the wall where the pre-work meetings were held.

- Those union members at the meeting were advised to call their fellow union brothers and encourage them to return to work, despite their being out on approved FMLA.

- The company was being required to expend resources on overtime.

- It was these *motherfuckers* out on FMLA who were costing the company money.

- Plaintiffs Supervisr Jack Conway routinely addressed employees who took FMLA as part-timers.

- Jack Conway referred to the FMLA as the fraudulent medical leave act.

- Harold Hall who worked in the same facility as Mr. Henson testified that on multiple occasions he heard Jack Conway refer to employees on FMLA as "part-timers."

- Mr. Conway told Mr. Hall that he (Mr. Conway) could fire him.

- Mr. Hall testified that after he began taking FMLA leave he began receiving unwarranted production write-ups, including write-ups for mis-picks because he was taking FMLA.

- Mr. Hall ceased taking FMLA leave, despite needing to care for his seriously ill relative.

- In the other facility where Mr. Lebb had supervisory authority, he and other managers would also make negative comments about employees taking FMLA.

- Joseph Neal who was employed at the other facility returned from FMLA being ridiculed for going to Disneyworld. Mr. Lebb singled Mr. Neal out for other comments.

- Mr. Lebb expressed satisfaction about an employee being fired who was on FMLA.

- An employee named Pete had his job threatened when he took FMLA leave. (PA421-27).

- On several occasions Nate Halmon had disagreements with Mr. Conway where he told Mr. Conway he had FMLA for a family member and Mr. Conway responded that it did not matter; he (Mr. Halmon) should have been at work. (PA490-91).

13

(Compare trial court's disregarding most of these facts) (Opinion at 28).

This has to be *per se* interference – conduct designed to discourage employees from use of FMLA 29 C.F.R. 825.220(b). And for sure it expressed bias against employees who use FMLA. The red faced anger and frustration against FMLA was palpable. Harold Hall got the message when he stopped taking FMLA. The pattern of direct and implied threats should be taken at face value. The message was – "don't take FMLA or else." The presumption by those present was that these threats would be acted upon.

Once a plaintiff demonstrates by direct evidence that the FMLA was a substantial factor in the adverse employment decision, the burden shifts to the defendant to present evidence that the plaintiff would have been terminated regardless of the FMLA leave. *Id*. at 147 (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989)). *See also Spring v. Sealed Air Corporation*, 483 Fed. Appx. 765, 769 (3d Cir. 2012); *Parker v. Hahnamann University Hosp.*, 234 F. Supp. 2d 478, 483-84) (D.N.J. 2002) *but see, Liechtenstein v. University of Pittsburgh,* 691 F.3d 294, 302 (3rd Cir 2012) (leaving open whether the Third Circuit will follow the Sixth Circuit and Department of Labor).

The Third Circuit should follow courts within the Fifth Circuit and the Sixth Circuit Court of Appeals, which deferred to the Department of Labor.  District courts within the Fifth Circuit have continued to allow mixed-motive instruction under the FMLA. See, e.g., *Harville v. Texas A&M Univ.*, 2011 WL 2295279, at *8 (S.D. Tex. June 8, 2011) (Exhibit AA). Moreover, the Sixth Circuit has directly addressed the issue in *Hunter v. Valley View Local Schools*, 579 F.3d 688 (6th Cir. 2009). These courts applied *Chevron U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843 (1984) (upholding the

agency determination under a deferential standard).   The Department of Labor's interpretation of the FMLA permitting mixed-motive claims is a permissible construction of the statute. This Court should give appropriate deference to the agency and permit a mixed-motive instruction.

The trial court held that even if there was direct evidence that USF would have terminated Mr. Henson anyway.  Yet a reasonable jury can discredit insubordination as the real reason (below at 18-21) *and* can find similarly situated employees engaged in similar or worse conduct (see below at 21-22).

### 2. Mr. Henson also has strong circumstantial evidence which should require a jury to determine the real reason.

#### a.  Mr Henson establishes a *prima facie* case under the FMLA because he was terminated while on FMLA and against the backdrop of antagonism against employees who take FMLA.

The trial court held that Mr. Henson's case was so terribly weak he could not even muster a prima facie case. (Op. at 29). But the trial court failed to appreciate the low threshold for a prima facie case: *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, (1981) ("not onerous"); *Torre v. Casio, Inc.,* 42 *F.*3d 825, 829 (3d Cir.1994) ("relatively simple") (quoting *McKenna v. Pac. Rail Serv.,* 32 *F.*3d 820, 825 (3d Cir.1994)); *Massarsky v. Gen. Motors Corp.,* 706 *F.*2d 111, 118 (3d Cir.) ("easily made out") (*cert. denied,* 464 *U.S.* 937 (1983)).

The Third Circuit, like New Jersey courts only require the plaintiff to show that he was doing the job over a duration of time: *Sempier v. Johnson & Higgins,* 45 *F.*3d 724, 729 (3d Cir.), *cert. denied,* 515 *U.S.* 1159, 115 *S.Ct.* 2611, 132 *L.Ed.*2d 854 (1995), objective experience and education necessary to qualify. *See also Weldon v. Kraft, Inc.,* 896 F.2d 793, 797-99 (3d Cir.1990) (plaintiff qualified); *Jalil v. Avdel Corp.,* 873 *F.*2d 701, 707 (3d

Cir.1989), *cert. denied,* 493 *U.S.* 1023 (1990), long-term performance of duties clearly established "qualifications."

An FMLA *retaliation*, requires a three-prong showing: (1) he took FMLA leave; (2) he suffered an adverse employment decision; and (3) the adverse employment decision was causally related to taking leave. *Id. Conoshenti v. Public Service Electric & Gas Company*, 364 F.3d 135, 146-47 (3d Cir. 2004). *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,* 691 F.3d 294, 301 (3d Cir. 2012).

But the trial court relied on *Yashenko v. Harrah's NC Casino Co., LLC,* 325 F. Supp. 2d 653, 662 (W.D.N.C. 2005), *aff'd* 446 F.3d 541 (4th Cir. 2006) in determining that Mr. Henson had no *prima facie* case. Yet, *Yashenko* was not dismissed on the *prima facie* case; it was dismissed on plaintiff's inability to produce any evidence on the ultimate burden. *Id.* at 550.

The trial court truncated *Yashenko* to mean that employees previously approved for FMLA without incident can not establish a prima facie case. (Op. at 20). But that is not at all the proposition that *Yashenko* stands for. Rather, an employer may rebut the presumption it terminated an employee already out on FMLA because it would have done so anyway.

In *Yashenko* there was overwhelming evidence that the company intended to restructure his position *prior* to the requested leave, preference was being given to Indian Tribal members in the consolidation procees; and the plaintiff refused to apply for other open positions. The fact of not discriminating against him in the past was of no real consequence – the plaintiff could not even show that as an offer of *some* proof. The simple fact is that the plaintiff there offered no evidence whatsoever that the asserted

reason, the re-organization, was not the real reason. So, it was not even that the plaintiff there did not make out a prima facie case – he did. He was terminated while out on FMLA. The plaintiff in *Yashenko* just lacked anything to overcome the asserted reason – not true here.

Even if that were the reasoning in the Fourth Circuit that an employer need only show lack of incident in prior FMLA requests/leave, that should not be accepted here because it would immunize the employer allowing it to take action against a recurrent FMLA user, the employee who would logically be the largest target.

And even if this were the reasoning in *Yashenko* it would be inapposite here because in this case, USF was not approving the leave – it had an administrator who was making the approval decisions. (PA337, 339, 341). But the cases relying on *Yashenko* in the Third Circuit cite it for the proposition that the employee must overcome the employees stated reason to overcome summary judgment. *Marra v. Philadelphia Housing Authority,* 497 F.3d 286, 308 (3d Cir. 2010).

The low threshold for a prima facie FMLA retaliation case can be shown in a variety of ways. Causation in an FMLA retaliation case can be established when the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive." *Lichtenstein v. University of Pittsburgh Medical*, 691 F.3d 294, 307 (3d Cir. 2012) (citing *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)). Otherwise the totality of the circumstances, such as ongoing antagonism, may give rise to create an inference." *Id.* (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000)). *Palen v. Alcan Packaging* 511 F. Supp. 2d 445, 449 (D.N.J. 2007) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000)). *See also O'Hare v. McLean Packaging*

17

*and Trucking*, 2009 WL 3207277 at *6 (D.N.J. 2009) at *8 (citing *Kachmar v. SunGard Dadt. Sys.*, 109 F.3d 173, 177 (3d Cir. 1997))

It is undisputed that Mr. Henson was terminated during a designated FMLA period. (PA366). This alone should be sufficient to get beyond this low hurdle. Mr. Henson can also demonstrate ongoing antagonism against employees who take FMLA." (See above at 4-5).

### 3. USF asserts it terminated Mr. Henson for insubordination and lack of remorse.

Once the plaintiff makes out a *prima* facie case, the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its adverse employment action." *Naber*, 473 F. App'x at 160 (quoting *Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 571 (M.D. Pa. 2004)). If the defendant employer can offer such a reason, the presumption of unlawful discrimination falls away, and the burden shifts back to the plaintiff, who must show that the employer's proffered reason was simply a pretext for retaliatory animus owing to the plaintiff's decision to take FMLA leave. *Id.* The burden shifts back to Mr. Henson to submit sufficient evidence for a reasonable jury to determine that FMLA or race was a factor in the decision to terminate because USF asserts Mr. Henson was insubordinate and lacking in remorse.

### 4. Summary judgment should be reversed because there is sufficient evidence for a reasonable jury to believe that the FMLA was a substantial factor in the decision to terminate his employment.

A plaintiff can avert summary judgment by 1) showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for

[the asserted] non-discriminatory reasons;" 2) provide evidence that "after taking FMLA leave he was treated less favorably than other similarly situated employees who did not take FMLA leave" *Lewis v. School Dist. #70*, 523 F.3d 730, 741 (7th Cir. 2008) (quoting *Burnett v. LFW, Inc.*, 472 F.3d 471, 481-82 (7th Cir. 2006)); and 3) "that the employer has discriminated against *other persons* within plaintiff's protected class." *Simpson v. Kay Jewelers, Division of Sterling, Inc.*, 142 F.3d 639, 646 (3d Cir. 1998) (citing *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994)); *see also Consohenti*, 364 F.3d at 143 (test for a retaliation claim). USF asserts that Mr. Henson was terminated for insubordination. (Def. Br. at 18-19).

### a. A reasonable jury can discredit the asserted reason for the termination – insubordination – and therefore find FMLA and/or race was a contributing factor.

A plaintiff can avert summary judgment by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Mr. Henson presents two witnesses who both testify that his conduct was not insubordination – which is a terminable offense but; instead his conduct was failure to follow instructions - not terminable. (PA377, 385). The trial court improperly rejected both witnesses' testimony.

One witness, Frank Kaiser, Daytime Warehouse Manager, testified that insubordination is defined by an employee's *hostility* toward a supervisor. (Op. at 22) Yet the trial court accepted Mr. Kaiser's changed testimony that because Mr. Henson

was aware that the pallet was leaning this somehow, without explanation, negated the hostility requirement. Mr. Kaiser's contradictory testimony can not negate his earlier testimony that hostility is a component of insubordination. The trial court *weighed the credibility of the witness* in accepting the changed version of the testimony and negated hostility as an element of "insubordination."

The second witness, James Anthony, Shop Steward corroborated that in his experience and his opinion that Mr. Henson's conduct amounted to failure to follow instructions. (Op. at 24). But the trial court disregarded this testimony too, by finding that even if it were only "failure to follow instruction" – per Mr. Anthony – it was not based upon *race*. *Id.* But this has no relevance to Mr. Henson's FMLA case.

The lack of a legitimate reason to terminate – the lack of insubordination which Mr. Anthony held to – is the precise evidence that the jury could find to be a contrived reason to terminate Mr. Henson's employment because he used FMLA. So, a jury is entitled to believe the FMLA is the real reason.

Mssrs. Kaiser and Anthony corroborating each other – are also corroborated by the record of discipline. Every employee charged with insubordination was hostile toward the supervisor (see below at 21-22); while the one who repeatedly disregarded a supervisor's instructions was charged with a failure to follow instructions. If Mr. Henson only failed to follow instructions – he should never have been subject to termination. So his level of remorse should be irrelevant – even though Mr. Henson was apologetic. (see below at 24).

Finally, a reasonable jury can also discredit the asserted reasons for termination because the Manager who made the allegation was Jack Conway and the ultimate

20

decision maker was Mr. Lebb. A reasonable jury can determine that Jack Conway lacks credibility for two reasons. First, USF terminated Mr. Conway's employment for dishonesty, as part of a "mutual agreement." (PA417-18). USF's own management view him as not credible, labeling him a thief. (PA419-20). Additionally, there is direct or circumstantial evidence that Jack Conway has an animus against those who exercise their FMLA rights as does Robb Lebb. (See Brief at 6-7). Therefore, a reasonable jury can discredit the asserted reason and based upon all of the facts determine that discriminatory intent was the real reason for Mr. Henson's termination. This alone should preclude summary judgment.

### b. Similarly situated employees engaged in the same or worse conduct but retained their employment.

The trial court deemed plaintiff's comparator evidence insufficient because the trial court deemed that they were not similarly situated *in all* respects. Yet Mr. Henson provided evidence of several other employees who engaged in insubordination and dishonesty and remained employed there. In the following examples, the decision maker was Robb Lebb.

It is undisputed, Terrance Turpin, a non-FMLA employee, was insubordinate: he was delegated work by a supervisor. (PA409). In response, Terrance Turpin told the supervisor, "Fuck you, I'm not doing it." (Id.). Mr. Turpin was charged with insubordination. (PA408). Mr. Turpin was given notice of his termination, however, unlike Mr. Henson, he was permitted to return to work at USF. (Id.).

It is indisputable that Christopher Lawson[5] (Caucasian, non-FMLA) was insubordinate. (PA381). Bob Bergen, Supervisor, gave Mr. Lawson a work order. Mr. Lawson gave the order back to Mr. Bergen, and said he did not want to do it, and told the supervisor to give the order to someone else. (PA386). As a result of Mr. Lawson's refusal, the supervisor gave the work order to another employee, Scott Gallagher. (PA404, 538). At the time Mr. Lawson committed insubordination he had the lowest seniority on the shift. (PA539). Mr. Lawson was charged with insubordination. Mr. Bergen reported the incident to Rob Lebb. (PA386). Mr. Lawson, though, unlike Mr. Henson, was only suspended and was permitted to keep his job. (PA404, 412).

On February 28, 2008, Kareem Anthony (who did not take FMLA) failed to follow instructions: on repeated occasions Mr. Anthony was warned about the SKU location on the pallet. (PA505). Yet Mr. Anthony only received a verbal warning. (PA505).

On October 20, 2009, Mr. Anthony was terminated for dishonesty and falsifying company documents. (PA491). Mr. Anthony falsified records by placing a false order in the computer system and making it appear that he picked up the order. Yet on November 29, 2009, Mr. Anthony was reinstated through a last chance agreement. (PA492). The reinstatement agreement converted the termination to suspension but provided that this was a last chance – Mr. Anthony would be precluded from arbitrating any future termination. (PA492).

Incredibly on September 7, 2011, Mr. Anthony was again given lenient treatment when he was again dishonest. (PA500). Although dishonesty is a terminable offense,

---

[5] In addition to insubordination, Christopher Lawson had a string of other infractions but was permitted to keep his job. These infractions include: three to four unexcused absences (PA465-468), being late twice (*Id*.), multiple mispick errors (*Id*.), and an incident where he was "messing around" with another employee (*Id*.).

and Mr. Anthony proved to be a dishonest person as opposed to engaging in one mistake of being dishonest – USF again did not terminate him. Rob Lebb was the decision maker. (PA 412, 491, 492, 500).

In determining Mr. Henson's evidence was insufficient the trial court relied on *Wilcher v. Postmaster Gen.*, 441 F. App'x 879 (3d Cir. 2011) and *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220 (3d Cir. 2009).

> To be considered similarly situated, comparator employees must be similarly situated in all relevant respects… tak[ing] into account factors such as the employee's job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in *Wilcher*, 441 F. App'x at 882 (citations omitted). In terms of the misconduct, the comparators must have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Opsatnick*, 335 F. App'x at 223.

(Op. at 25).

But *Wilcher* is inapposite. In *Wilcher*, the court held that the comparators were not "similarly situated" because they all held a different position from the plaintiff, the plaintiff held a temporary supervisor position during the infraction, and the comparators' misconduct was different. In *Opsatnik*, the Court found there were mitigating factors including the comparator's employment in other divisions and the prior offense history.

But, there are many factors that *can* be relevant to this fact intensive inquiry. See *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). Here, the comparator evidence consists of 1) union-labor employees; 2) governed by the same contractual standards; 3) who had not taken FMLA; 4) employed at the same labor-level position; 5)

governed by the same collective bargaining agreement; with the same final decision maker – Robb Lebb; who were charged with terminable offenses without any mitigation.

The trial court was overly restrictive in requiring comparators to have engaged in precisely the same conduct. Instead, comparators means to have engaged in conduct of "comparable seriousness." *Opsatnik* at 223, citing *Wright v. Murray Guard, Inc.,* 455 F.3d 702, 710 (6th Cir.2006). Similar in all relevant respects means the same decision maker, subject to the same standards, and engaged in similar conduct without differentiating factors that would entail different treatment. *Id.*

The conduct need not be wholly similar. Evidence of worse conduct treated more favorably is sufficient. *Simpson v. Kay Jewelers,* 142 F.3d 639, 645 (3d Cir. 1998), See also *Fonseca v. Food Services of Arizona, Inc.,* 374 F.3d 840, 848 (9th Cir. 2004); *Anderson v. National Railroad Passenger Corp.,* 360 F.Supp.2d 8, 10 (D.D.C. 2003); *Augustus v. AHRC Nassau*, 2012 WL 6138484 (E.D.N.Y.,2012); *Berryman v. SuperValu Holdings, Inc.*, 2010 WL 1257841 (S.D.Oh. 2010). (compare with Op. at 25 prohibiting worse or comparable conduct). Undoubtedly, the conduct of all of these comparators was sufficient to warrant the recommendation to terminate.

The trial court placed overwhelming stock in the idea that Mr. Henson could be differentiated because he lacked remorse. (Op. at 26). This though was a fact question because Mr. Henson testified to being apologetic. (PA399). Contrary to USF's claim that Mr. Henson lacked remorse, Mr. Henson testified that he apologized to Jack Conway and apologized again in the meeting regarding his termination. (PA399). Mr. Henson also contested USF's assertion that he cursed at Mr. Conway after learning of his

24

termination. Far from cursing at Mr. Conway, Mr. Henson testified that he plead for his

job back. (PA364, 400). As the facts are interpreted in the light most favorable to the

non-moving party, Mr. Henson's testimony created a genuine issue of material fact that

precluded award of summary judgment.

> **5.  The Court should reverse the summary judgment against Mr. Henson because his supervisor, the Night Manager, routinely engaged in ridiculing African-American employees.**

If a co-worker has the authority to control the work environment, any harassing

behavior by him will cause the employer to be liable.  *Entrot v. BASF Corp.*, 359 N.J.

Super 162, 175 (App. Div. 2003).  The Court in *Entrot* followed *Dinkins v. Charoen*

*Pokphand USA, Inc.*, 133 F. Supp. 2d 1254, 1266 (M.D. Ala. 2001) in applying EEOC

guidelines, that a supervisor is one empowered to direct a co-employee's day-to-day

activities.  *Entrot* at 175.  This includes employees who have apparent

authority.  *Id*. Clearly, Mr. Conway had sufficient authority to create vicarious liability.

Mr. Henson must show that the complained of conduct would not have occurred but

for his race. *Velez v. City of Jersey City*, 358 N.J. Super. 224, 234 (App. Div. 2003). This test

is automatically met where the alleged conduct is racial in nature. *Id*. (citing *Lehman* and

*Woods-Pirozzi v. Nabisco Foods, Inc.*, 290 N.J. Super 252, 266 (App. Div. 1996)). Here all of

the comments were racial in nature:

- Comments referring to the size of African-American men"s genitalia. (PA427, 437-39, 473-74).

- Imitating African-American"s dancing with physical gestures. (PA434-39).

- References to African-American employees as "brothers." (PA475).

- Referring to the employees as the "BET lunch." (PA393-95).

- Asking the employees if they were eating chicken and grape soda. (PA390). The comments were directed at a group of people that included Mr. Henson and were made in Mr. Henson's presence. (PA548). The comments were clearly racial in nature.

### a. A reasonable jury can find that the conduct was unwelcomed and pervasive.

When considering whether conduct is "severe or pervasive," a court must determine whether a reasonable person would find the work environment hostile. *Shepherd v. Hunterdon Developmental Corp.*, 174 N.J. 1, 24 (2002) (citing *Lehmann v. Toys R Us*, 132 N.J. 587, 604 (1993)). In *Shepherd*, the New Jersey Supreme Court reversed summary judgment on a hostile work claim based upon race, grounded upon an environment which was tense, had several comments based upon race and supervisors retaliated in the form of saying what goes around comes around. *Shepherd*, 174. N.J. at 615-21. *Shepherd* relied upon *Woods-Pirozzi v. Nabisco Foods*, 290 N.J. Super. 252 (App.Div. 1997). *Shepherd*, 174 N.J. at 626. In *Woods*, the court concluded that it was a jury question of fact as to whether a supervisor"s comments calling a female employee a "loser" and a "woman…pain in my ass" qualified as severe and pervasive conduct under the NJLAD. The facts here far exceed what occurred in *Shepherd*.

There is no specific formula for the frequency the harassment must occur for it to be pervasive. One severe incident can be sufficient in itself. *Taylor v. Metzger*, 152 N.J. 490 (1998). The frequency varies inversely with the severity or seriousness of the harassing conduct. *Id. See also T.L. v. Toys R. Us, Inc.*, 255 N.J. Super. 616, 634-35 (App. Div. 1992). *Wilson v. Wal-Mart Stores*, 158 N.J. 263 (1999) (male supervisors repeated, crude, indecent comments to female employee); *Mancini v. Township of Teaneck*, 349 N.J. Super

527 (App. Div. 2002) (police captain and other male officers subjected first female officer to degrading sexual conduct over period of years) *Kelly v. Bally's Grand, Inc.*, 285 N.J. Super 422 (App. Div. 1995) (64-year-old plaintiff was subjected to numerous age based statements of bias); *Zalewskiv v. Overlook Hosp.*, 300 N.J. Super 202 (Law Div. 1996) (heterosexual male employee who was subjected to repeated comments and conduct my coworkers based on gender stereotype had an actionable hostile work environment claim); *see also Blakey v. Continental Airlines, Inc.*, 164 N.J. 38 (2000) (male pilots repeatedly used work related online forum to communicate negative comments aimed at female pilot who had previously won a federal sexual-harassment case against the airline).

The comments were so frequent, nearly every day, and so offensive that Mr. Henson had no choice but to try to block out Mr. Conway. (PA393, 397, 398). It got to the point where Jack Conway made so many comments that Mr. Henson stopped counting. (PA391). Obviously, the comments permeated the work environment. Mr. Conway's racist vaudeville routine was repetitive, degrading and humiliating. Employee #3 admits that he could see how a person could be offended by the comments. (PA549). USF acknowledges that Jack Conway made racially- charged comments. (PA60). Consequently, a reasonable jury could find sufficiently frequent and serious incidents, which by their cumulative effect, altered the work environment.

## IX.    CONCLUSION

Therefore, Plaintiff requests this Court reverse summary judgment and remand for trial because there is sufficient evidence for a reasonable jury to conclude that Mr. Henson was wrongfully terminated under the FMLA and that there was a hostile work environment under the NJLAD.


Respectfully submitted,


Dated:        April 28, 2014            __s/ *William Riback*_____
                                        William Riback, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| ROBERT HENSON, | : | Civil Action No.: 11-cv-1809 (JBS)(KMW) |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **NOTICE OF APPEAL TO THE** |
| U.S. FOODSERVICE, INC., and | : | **U.S. COURT OF APPEALS FOR** |
| and JOHN DOES 1-10, | : | **THE THIRD CIRCUIT** |
| | : | |
| Defendants. | : | |

**PLEASE TAKE NOTICE** that Mr. Robert Henson, Plaintiff in the above captioned case, hereby notices his appeal to the United States District Court of Appeals for the Third Circuit from the final judgment entered in this action on the 11th day of November, 2013.

WILLIAM RIBACK, LLC

Dated:  December 16, 2013          ___/s/William Riback_____
                                   William Riback, Esquire

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ROBERT HENSON,

        Plaintiff,

     v.

U.S. FOODSERVICE, et al.,

        Defendants.

Civil No. 11-1809 (JBS/KMW)

**ORDER**

This matter comes before the Court on Defendant U.S. Foodservice's motion for summary judgment. [Docket Item 46.] The Court having considered the parties' submissions and having heard oral argument on November 6, 2013; for the reasons explained in the Opinion of today's date; and for good cause shown;

IT IS, this __19th__ day of __November__, 2013 hereby

ORDERED that Defendant U.S. Foodservice's motion for summary judgment [Docket Item 46] is granted and final judgment is entered for Defendant U.S. Foodservice; and it is further

ORDERED that the Clerk of Court shall close this case on the docket.

                    **s/ Jerome B. Simandle**
                    JEROME B. SIMANDLE
                    Chief U.S. District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT HENSON,<br><br>        Plaintiff,<br><br>   v.<br><br>U.S. FOODSERVICE, et al.,<br><br>        Defendants. | Civil No. 11-1809 (JBS/KMW)<br><br><br>**OPINION** |

APPEARANCES:

William Riback, Esq.
Alex Schwartz, Esq.
Lauren Plevinsky, Esq.
William Riback LLC
132 Haddon Ave.
Haddonfield, NJ 08033
    Attorneys for Plaintiff Richard Henson

Karla Grossenbacher, Esq.
Taron K. Murakami, Esq.
Seyfarth Shaw LLP
975 F Street NW
Washington, DC 20004
     -and-
Alnisa S. Bell, Esq.
Seyfarth Shaw LLP
620 Eighth Avenue
New York, NY 10018
    Attorneys for Defendant U.S. Foodservice, Inc.

**SIMANDLE**, Chief Judge:

## I.    INTRODUCTION

Plaintiff Robert Henson brings this action against his

former employer Defendant U.S. Foodservice, Inc. ("US Foods")

and Defendants John Does 1-10 alleging claims for interference

and unlawful retaliation under the Family Medical Leave Act
("FMLA") and unlawful retaliation based on race and hostile work
environment under the New Jersey Law Against Discrimination
("NJLAD"). This matter comes before the Court on Defendant US
Foods' motion for summary judgment on all counts. [Docket Item
46.] The Court heard oral argument on November 6, 2013. US
Foods' motion will be granted because US Foods had a legitimate,
non-discriminatory reason for terminating Plaintiff, which has
not been cast into reasonable doubt, and Plaintiff was not
subjected to a racially hostile work environment.


**II. BACKGROUND**

    **A. Factual Background**

        **a. Plaintiff's Employment with US Foods**

US Foods distributes food, equipment, and related products
to restaurants, hospitals, and other institutional customers.
(Def. Statement of Undisputed Facts ("SOF") ¶ 1.)

Plaintiff, who is African-American, began working for US
Foods on or about April 4, 2004. (Def. SOF ¶ 14.) Plaintiff
worked as a Selector for US Foods' Bridgeport facility in
Bridgeport, New Jersey. (Def. SOF ¶ 15.) Selectors locate food
products in the warehouse and transfer them to pallets. (Def.

SOF ¶ 16.) The boxes of product on pallets can be quite heavy and are stacked quite high. (Def. SOF ¶ 20.)

"Leaning pallets," i.e., pallets with product leaning to the side, must be rebuilt because they are significant safety risks. (Def. SOF ¶ 20.) Leaning pallets easily collapse, cause boxes to fall and, thus, pose a significant risk of injury. (Def. SOF ¶ 20.) Leaning pallets are also a risk to the product, which can be damaged from falling. (Def. SOF ¶ 21.) Pallets usually lean because of crushed product, which US Foods does not ship because of the risk of food spoilage or damage. (Def. SOF ¶ 21.) Customers often refuse to accept leaning pallets and delivering such pallets threatens customer relationships. (Def. SOF ¶ 21.)

Plaintiff's union shop steward, William Anthony, who is also African-American, testified that Selectors "must break [a leaning pallet] down if they're told to break it down." (Anthony Dep. 29:8-9.) Anthony also testified that he had "never" seen a supervisor instruct an employee to return a leaning pallet and bring a new one. (Anthony Dep. 29:18.) Frank Keyser, the day warehouse manager, testified that, when there is a leaning pallet, "[t]he procedure would be to rebuild the skid and rewrap the skid." (Keyser Dep. 21:16-17.)

3

US Foods' Selectors at its Bridgeport facility are governed by the Rules of Conduct ("Rules"), which were negotiated by US Foods with the Union and which were approved and signed by the Union. (Def. SOF ¶ 9.) The Rules provide a non-exclusive list of required discipline and standards of conduct that employees must observe. (Def. SOF ¶ 10.) The Rules specify that certain conduct will subject an employee to "Immediate Termination," including "Insubordination: including the failure to follow a direct order from a supervisor/manager." (Def. SOF ¶ 12.)

### b. Plaintiff's Mispicks

Selectors are subject to various performance standards, including "mispicks," which occur when employees incorrectly select product for delivery to customers. (Def. SOF ¶¶ 32-33.) In 2008, Plaintiff received disciplinary write-ups for mispicks on eight separate occasions. (Def. SOF ¶ 35.) In 2009, Plaintiff received disciplinary write-ups for mispicks on nine separate occasions. (Def. SOF ¶ 36.) In 2010, Plaintiff received one warning for mispicks. (Def. SOF ¶ 37.)

During Plaintiff's employment, US Foods' employees were subject to progressive discipline for mispicks: (1) documented discussion, (2) documented discussion, (3) written warning, (4) second written warning, (5) one-day working suspension, (6) three-day working suspension, and (7) termination. (Def. SOF ¶

4

34.) Disciplinary write-ups for mispicks were removed from an employee's file if more than one year passed without that employee receiving a subsequent disciplinary write-up for mispicks. (Def. SOF ¶ 34.) US Foods management removed mispick disciplinary write-ups from Plaintiff's employment file on a number of occasions. (Def. SOF ¶ 41.)

### c. Plaintiff's Termination

On August 26, 2010, Plaintiff was preparing a shipment that included one full pallet plus five additional boxes of frozen crab legs for a major US Foods customer. (Def. SOF ¶ 43.) Plaintiff retrieved a full pallet of crab legs from the warehouse freezer and added five boxes to the top. (Def. SOF ¶ 43.) The pallet contained approximately 25 boxes weighing 30 pounds each, for a total of 750 pounds stacked five feet high. (Def. SOF ¶ 45.) Each box sold, at that time, for $144.60, and the total value of the 25-box shipment was over $3,500. (Def. SOF ¶ 44.)

Plaintiff "brought out a skid that was leaning." (Pl. Dep. 54:13.) When Plaintiff's supervisor Jack Conway saw the leaning pallet, he instructed Plaintiff to rebuild it. (Def. SOF ¶ 48.) Instead of following Conway's direction, Plaintiff switched the leaning pallet with a new "better-looking" one without Conway's permission. (Def. SOF ¶ 49.) He added five boxes to the new

5

pallet, returned the leaning pallet to the freezer, and left work for the day. (Def. SOF ¶ 49.) Plaintiff did not follow Conway's instruction because he "was just really trying to get home" and because he thought his way was "better." (Def. SOF ¶ 50.) Plaintiff had previously rebuilt pallets as instructed, and he admits that leaning pallets are unsafe. (Def. SOF ¶ 52.)

Conway alleged that Plaintiff was insubordinate. (Pl. Counter SOF ¶ 3.) Conway told Robb Lebb, Director of Operations, that when Conway told Plaintiff to rebuild the pallet, Plaintiff responded that he would not rebuild it and instead would retrieve a new pallet. (Lebb Decl. ¶ 25.) Conway told Lebb that he then reiterated his instruction to rebuild the pallet and expressly told Plaintiff not to swap the leaning pallet with a new pallet. (Lebb Decl. ¶ 25.) Anthony, the union shop steward, also testified that Conway "said he told [Plaintiff] at least two, three times to rebuild that pallet." (Anthony Dep. 58:21-22.)

The day after the incident, Plaintiff met with Conway; his Union shop steward, William Anthony; and Rob Lebb. (Pl. Dep. 58:8-11.) Anthony testified that when Plaintiff was questioned about "why he did not do what he was told as far as rebuilding the pallet," Plaintiff said "his way was better . . . why should he rebuild the pallet when he can just go in the slot and take

6

another pallet out." (Anthony Dep. 18:14-21.) Anthony testified that Plaintiff "was told to specifically undo the pallet that he had placed in the dock" and that Plaintiff "thought it was easier for him to do it his way as opposed to the way he was being told to do it." (Anthony Dep. 18:23-19:5.) Anthony testified that Plaintiff "wasn't really remorseful in that meeting, no. Kept saying he indicated that he felt his way was better than the company's way. He did not show no remorse in that meeting, no. He actually thought he was not doing nothing wrong." (Anthony Dep. 60:21-61:2.)

Plaintiff was terminated on August 31, 2010 by US Foods for his refusal to rebuild the crab-leg pallet per Conway's direct orders. (Def. SOF ¶ 54.) The stated reason for the termination was insubordination and lack of remorse. (Pl. Counter SOF ¶ 28.) The decision to terminate Plaintiff's employment was made by Rob Lebb, Director of Warehouse Operations, and Rick Hutter, Regional Vice President of Operations, based on the information Lebb obtained about the incident. (Def. SOF ¶ 54.)

US Foods alleged that Plaintiff was not contrite. (Pl. Counter SOF ¶ 7.) At the meeting after the incident, Lebb perceived that Plaintiff did not express remorse for intentionally ignoring his supervisor's instructions. (Lebb Decl. ¶ 25.) Plaintiff continues to maintain that he did the

7

right thing on August 26, 2010 and that he was never insubordinate. (Def. SOF ¶ 62, Pl. Response to Def. SOF ¶ 62.)

At some point during the termination process, Anthony saw Conway and Lebb speak privately and "whatever occurred between their conversation, I don't know." (Anthony Dep. 36:25-37:1.)

Plaintiff grieved his termination through the Union. (Def. SOF ¶ 57.) US Foods denied Plaintiff's grievance, and the Union did not exercise its right to appeal the termination decision. (Def. SOF ¶ 63.)

During the grievance process, neither Plaintiff nor the Union ever raised allegations of race or FMLA discrimination. (Def. SOF ¶ 64.)

US Foods later terminated Plaintiff's supervisor Conway for theft and dishonesty. (Pl. Counter SOF ¶ 12.)

### d. Plaintiff's Work Environment

A group of African-American employees typically ate lunch together in the break room. (Pl. Counter SOF ¶ 77.) Plaintiff testified that Conway made jokes in front of him and other African-American employees asking them during their lunch break if they were eating chicken and grape soda, calling their lunch break the "BET lunch,"[1] and commenting about his African-American

---

[1] The "BET lunch" reference arose because the employees watched Black Entertainment Television. (Def. SOF ¶ 71.)

8

step-children listening to rap music. (Def. SOF ¶ 65.) Plaintiff
also alleges that he heard Conway making racially-charged jokes
during his lunch break, including jokes about African-Americans'
genital sizes and watching basketball. (Def. SOF ¶ 66.)
According to Plaintiff, all of Conway's comments occurred in the
break room during the third lunch break. (Def. SOF ¶ 67.) These
comments occurred "every day at lunchtime . . . with another
black employee, [Conway] would go back and forth with." (Pl.
Dep. 53:7-9.) Plaintiff "didn't want to hear" and "took
offense." (Pl. Dep. 53:10.)

Selectors can choose between three different lunch break
options and they are not required to eat lunch in the break
room. (Def. SOF ¶ 68.) Plaintiff chose to attend the third lunch
break. (Def. SOF ¶ 68.)

Plaintiff claims that Rob Lebb had a policy of telling
African-American Selectors who were talking at work to stop, but
allowing Caucasian Selectors to continue socializing. (Def. SOF
¶ 75.) On one occasion in 2006 or 2007, a supervisor told
Plaintiff and another African-American Selector to stop talking
and return to work but, on another occasion, Plaintiff witnessed
the same supervisor permitting Caucasian Selectors to continue
speaking. (Def. SOF ¶ 76.) Plaintiff admits that he should not
have been talking during work hours. (Def. SOF ¶ 76.) Plaintiff

PA0011

testified that he once saw another supervisor tell two African-American Selectors who were talking to return to work while allowing Caucasian Selectors to continue talking. (Def. SOF ¶ 77.)

Plaintiff claims that, on one occasion, he saw Caucasian Selectors sent home for misconduct and then called back by Conway. (Def. SOF ¶ 78.) He also claims that, on one occasion, an African-American Selector was sent home for misconduct and not called back, but he admits that he does not know whether the African-American Selector was called back and does not know what the African-American Selector did that caused him to be sent home. (Def. SOF ¶ 78.) Plaintiff also admits that the African-American Selector does not claim that he was sent home because of racial reasons. (Def. SOF ¶ 78.)

Plaintiff believes that African-American Selectors received more disciplinary write-ups than Caucasian Selectors and were disciplined for mispicks that they did not actually have. (Def. SOF ¶ 79.) He testified that he "know[s]" Caucasian Selectors were disciplined less often "by them not complaining like everybody else." (Pl. Dep. 200:16-17.) He admits this belief is based solely on perception, the speculation of other coworkers, and hearing certain names called over the warehouse intercom. (Def. SOF ¶ 79.) Plaintiff does not know for a fact that white

10

employees were disciplined less often. (Pl. Dep. 203:25-204:2) He also has "no proof" that African-Americans were written up for mispicks they did not have. (Pl. Dep. 204:10-13.) Plaintiff is aware of at least one Caucasian Selector who received "a lot of mispicks," and at least two Caucasian employees complained to Plaintiff that they received mispick discipline that they did not deserve. (Def. SOF ¶¶ 80-81.) Plaintiff also perceived that he was disciplined for lateness when Caucasian employees were not. (Pl. Dep. 51:12-15.)

US Foods never told Plaintiff that he was being terminated or that his job was threatened because of his race. (Def. SOF ¶ 85.)

### e. Plaintiff's FMLA Usage

US Foods has an FMLA policy stating "[it] is the policy of US Foods . . . not to discharge or discriminate against any employee exercising his or her rights under the Federal Family and Medical Leave Act" and instructing employees who believe that they have been treated unfairly to contact the Division President or the President of Human Resources. (Def. SOF ¶ 22.)

US Foods never prevented Plaintiff from taking FMLA leave. (Pl. Dep. 40:6-8.) Plaintiff began taking FMLA leave in 2006. (Def. SOF ¶ 23.) He was granted an FMLA leave of absence beginning on August 28, 2006, and he did not return to work for

11

the remainder of the year, thus taking more than 12 weeks of FMLA leave. (Def. SOF ¶ 23.) He returned to work at his same position on January 9, 2007. (Def. SOF ¶ 23.) In 2007, Plaintiff took eight days of intermittent FMLA leave. (Def. SOF ¶ 24.) In March 2009, Plaintiff was approved for intermittent FMLA leave from February 23, 2009 to July 22, 2009 and, during that time period, he took at least 11 FMLA leave days. (Def. SOF ¶ 25.) In July 2009, Plaintiff requested approval for another period of intermittent FMLA leave from July 23, 2009 through December 20, 2009, and he took at least 10 days of leave during that period. (Def. SOF ¶ 25.) During the first two months of 2010, Plaintiff took at least 14 FMLA leave days. (Def. SOF ¶ 26.) He was then approved to take intermittent FMLA leave from March 10, 2010 through September 9, 2010, and he took at least 18 more FMLA leave days during that period. (Def. SOF ¶ 26.)

Plaintiff's termination occurred during a designated FMLA period. (Pl. Counter SOF ¶ 2.) Plaintiff believed that his termination was based on his FMLA leave "because [he] was on FMLA." (Def. SOF ¶ 27.) Plaintiff's employment was never directly threatened because of his FMLA usage. (Pl. Response to Def. SOF ¶ 28.)

According to Plaintiff, Darwin Moore, another US Foods employee who was terminated and filed a lawsuit alleging FMLA

12

and NJLAD violations, heard Rob Lebb tell employees that they were working more because of their "FMLA buddies" and encouraged employees to call people who were on FMLA leave and tell them to return to work. (Pl. Counter SOF ¶ 14.) Moore also testified that Lebb once said "these motherfuckers on FMLA [were] the reason [employees were] working . . . overtime." (Pl. Counter SOF ¶ 15.) Moore testified that an employee named Pete had his job threatened when he took FMLA leave. (Pl. Counter SOF ¶ 27.) Plaintiff also heard Conway refer once to the FMLA as the "fraudulent medical leave act." (Pl. Counter SOF ¶ 25.)

### f. US Foods' Anti-Harassment Measures

US Foods maintains a non-discrimination policy that prohibits unlawful discrimination based on, inter alia, race. (Def. SOF ¶ 2.) US Foods also provides annual training to its employees, supervisors, and management on its non-discrimination policy, anti-harassment policy, and policy prohibiting retaliation. (Def. SOF ¶ 2.)

US Foods maintains a toll-free Check-In Line that employees may use to anonymously report unlawful discrimination, harassment, or retaliation. (Def. SOF ¶ 4.)

On his day of hire, Plaintiff signed a form acknowledging that he read and understood US Foods' Equal Opportunity Policy and agreed to "immediately report any perceived violations of

13

[that policy] to [his] supervisor or the Human Resources Department." (Def. SOF ¶ 5.)

US Foods' Selectors are represented by Local No. 169 of the Teamsters Union. (Def. SOF ¶ 6.) Unionized Selectors may lodge complaints or grievances through their union. (Def. SOF ¶ 7.) During Plaintiff's employment, William Anthony, an African-American man, was the union steward. (Def. SOF ¶ 8.)

Plaintiff never reported Conway's conduct to Human Resources. (Pl. Dep. 53:24-54:1.) He never called the Check-In line. (Pl. Dep. 257:17-19.)

**B. Plaintiff's Claims**

Plaintiff claims that his termination constituted unlawful interference with his FMLA rights and unlawful termination in retaliation for exercising his FMLA rights. Plaintiff also asserts claims for hostile work environment and unlawful termination under the NJLAD. Plaintiff seeks damages, including punitive damages.

**C. Jurisdiction**

The Court has original jurisdiction pursuant to 28 U.S.C. § 1331 for the claims arising under federal law and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) for the claims arising under state law.

14

**D. Parties' Arguments**

Defendant US Foods seeks summary judgment on all claims, arguing that: US Foods never denied Plaintiff FMLA leave to which he was entitled; Plaintiff cannot show a nexus between his FMLA leave and his termination; due to Plaintiff's failure to rebuild the leaning pallet, Plaintiff was not meeting US Foods' legitimate expectations; US Foods had a legitimate, non-discriminatory reason for the termination; the conduct allegedly supporting Plaintiff's hostile work environment claim is unsupported by admissible evidence and is legally insufficient; and US Foods had effective anti-harassment policies that Plaintiff did not use.

In opposition, Plaintiff argues that he has direct evidence of animus; a reasonable jury could conclude that his race and/or FMLA usage factored into US Foods' decision to terminate him; other employees engaged in similar or worse conduct without being terminated; his failure to rebuild the pallet should have been characterized as failure to follow instructions, not insubordination; a reasonable jury could find that the harassment he endured was severe and/or pervasive; and other persons in protected classes suffered harassment and discrimination.

15

In Reply, US Foods argues that the alleged evidence of discriminatory and anti-FMLA animus is unrelated to the decision-making process behind Plaintiff's termination, there is no direct evidence, and none of the comparator employees are similarly situated.

## III. ANALYSIS

### A. Standard of Review

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Essentially, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

Parties must support their factual positions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . ., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). The Court must "draw all reasonable inferences in

16

favor of the non-movant." <u>Kowalski v. L & F Products</u>, 82 F.3d 1283, 1288 (3d Cir. 1996). The time for completing discovery under the Court's scheduling orders expired and no party asserts that additional discovery is needed.

**B. Plaintiff's Unlawful Termination Claims Fail**

Summary judgment will be granted on Plaintiff's unlawful termination claims under both the FMLA and the NJLAD because Plaintiff has not shown prima facie discrimination and because a reasonable jury could not find that US Foods' reason for Plaintiff's termination was pretextual.[2]

If Plaintiff presents direct evidence, then "the employer must prove that it would have fired the plaintiff even if it had not considered his [race or FMLA usage]." <u>Fakete v. Aetna, Inc.</u>, 308 F.3d 335, 338 (3d Cir. 2002). Direct evidence is "evidence of discriminatory attitudes about [FMLA or race] that were causally related to the decision to fire [Plaintiff]." <u>Glanzman</u>

---

[2] The Court will analyze Plaintiff's unlawful termination claims together because, under both the FMLA and the NJLAD, the Court examines whether the employer had a legitimate, non-discriminatory basis for the termination. <u>See, e.g.</u>, <u>Brown v. DB Sales, Inc.</u>, Civ. 04-1512, 2005 WL 3591533, at *6 (E.D. Pa. Dec. 29, 2005) ("If Plaintiff is able to successfully establish prima facie cases of both race discrimination claim and FMLA retaliation, both claims will be analyzed using the <u>McDonnell Douglas</u> three-stage burden shifting framework"); <u>Sarnowski v. Air Brooke Limousine, Inc.</u>, 510 F.3d 398, 403 (3d Cir. 2007) ("In applying the [NJ]LAD, . . . courts use the same burden-shifting framework . . . adopted in <u>McDonnell Douglas</u>").

v. Metro. Mgmt. Corp., 391 F.3d 506, 512 (3d Cir. 2004). "[S]tatements made by non-decision makers or by a decision maker unrelated to the decisional process itself are not direct evidence." Id. at 513 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 277 (1989)). In Glanzman, for example, the Third Circuit held that the plaintiff's supervisor's statement to two of her coworkers that he "wanted to fire her and 'replace her with a young chippie with big tits'" was direct evidence. Glanzman, 391 F. 3d at 510.

Plaintiff has not produced any evidence of discriminatory attitudes causally related to the termination decision. For example, he has not adduced any evidence of comments from Conway, Lebb, or Hutter that Plaintiff should be terminated because of his race or his FMLA usage. Even if Plaintiff had produced direct evidence, US Foods has shown, as discussed infra, that it would have terminated Plaintiff because of his insubordination and his lack of remorse.

Absent direct evidence, "[i]f circumstantial evidence of [FMLA or race] discrimination is used, then the proponent of the evidence must satisfy the three-step test of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Glanzman, 391 F.3d at 512.

To establish a prima facie discriminatory discharge case under the McDonnell Douglas framework in New Jersey, the

18

plaintiff must demonstrate: "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job." <u>Victor v. State</u>, 203 N.J. 383, 409 (2010). Plaintiff "is African-American, which is a protected class," and US Foods fired him. <u>Wilcher v. Postmaster Gen.</u>, 441 F. App'x 879, 881 (3d Cir. 2011). But Plaintiff has not established the third element of the prima facie case, <u>i.e.</u>, that he was performing the essential functions of the job. Plaintiff admitted that he did not follow Conway's order to fix the leaning pallet, leaning pallets are unsafe, and insubordination is a terminable offense. Therefore, Plaintiff has not established a prima facie discriminatory discharge case.

The prima facie requirements for an FMLA retaliation claim are similar: "(1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave." <u>Conoshenti v. Pub. Serv. Elec. & Gas Co.</u>, 364 F.3d 135, 146 (3d Cir. 2004). Plaintiff was on an intermittent FMLA leave period when he was terminated and his termination is an adverse employment decision. Plaintiff has not, however, shown that there was any connection between his termination and his FMLA usage. Plaintiff has been using FMLA

19

leave intermittently since 2004 without any adverse employment impacts, and "the Court is persuaded by evidence of Defendant's history of approving the Plaintiff's . . . FMLA leave that it did not act with discriminatory motive in firing the Plaintiff." Yashenko v. Harrah's NC Casino Co., LLC, 352 F. Supp. 2d 653, 662 (W.D.N.C. 2005), aff'd, 446 F.3d 541 (4th Cir. 2006). Plaintiff's unlawful termination claims therefore fail because Plaintiff has not established prima facie cases under the NJLAD or FMLA.

Even if Plaintiff had established a prima facie case of FMLA or race discrimination, Plaintiff's claims would not survive the remaining steps in the McDonnell Douglas analysis. After the prima facie step, "the burden shifts to the defendant to rebut the proof of discrimination by articulating some legitimate, nondiscriminatory reason for the employee's discharge." Jalil v. Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989). The plaintiff may then show that "the alleged reasons proffered by the defendant were pretextual and that the defendant intentionally discriminated . . . ." Id. To show pretext, Plaintiff must submit evidence which: "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder

20

to infer that discrimination was more likely than not a motivating or determinative cause . . . ." Fuentes v. Perskie, 32 F.3d 759, 762 (3d Cir. 1994).

A reasonable jury could not conclude that Defendant fabricated the reasons, i.e., insubordination and lack of remorse, for the termination. Plaintiff has admitted the following facts: the crab-leg pallet was leaning; leaning pallets are unsafe; his supervisor Jack Conway directed him to rebuild the pallet; instead of following Conway's order, Plaintiff switched the leaning pallet with a different one; insubordination includes the failure to follow a direct order; and insubordination subjects an employee to immediate termination. Based on Plaintiff's admissions, there is no factual dispute that Plaintiff was insubordinate and that his insubordination subjected him to termination.

Plaintiff argues that he apologized to Conway at the meeting after the incident and, therefore, there is a disputed issue of material fact as to whether he showed remorse. The Court finds that there is no factual dispute because, in his statement of facts, Plaintiff stated that he "was never insubordinate." (Pl. Response Def. SOF ¶ 62.) Plaintiff's union shop steward testified that, at the meeting after the crab-leg incident, Plaintiff "wasn't really remorseful . . . . Kept

21

saying he indicated that he felt his way was better than the company's way. He did not show no remorse in that meeting, no. He actually thought he was not doing nothing wrong." (Anthony Dep. 60:21-61:2.) Moreover, Defendant perceived that Plaintiff was not remorseful, and "[w]hat is at issue is the perception of the decision maker, not the plaintiff's view . . . ." Brown v. DB Sales, Inc., Civ. 04-1512, 2005 WL 3591533, at *5 (E.D. Pa. Dec. 29, 2005). Even if Defendant wrongfully perceived that Plaintiff was not remorseful, that erroneous perception would not show that Defendant acted with discriminatory intent.[3]

Plaintiff also argues that his conduct should be characterized as failure to follow instructions, which is not a terminable offense, rather than insubordination. Frank Keyser, the day warehouse manager who was not involved with Plaintiff's termination, testified that "failure to follow instruction would be if you are instructed to do something, to fix something, and you proceed not to do it . . . insubordination would be if you are told to do it, and you start getting hostile with me, refusing to do it . . . ." Plaintiff's counsel asked Keyser to

---

[3] Moreover, US Foods notes that it was lenient in disciplining Plaintiff for his mispick record. US Foods removed mispick disciplinary letters from Plaintiff's file and offered him training opportunities. This leniency shows a lack of discriminatory animus.

22

PA0024

classify the misconduct when an employee "is advised or told or instructed to unload or repackage a pallet, and in his mind he thinks it is better to restock and pull out a new, a different package." (Keyser Dep. 64:10-14.) Keyser responded that "[j]ust in that scenario you gave me, I would say that would be failure to follow instructions." (Keyser Dep. 64:19-21.) Plaintiff's counsel did not mention a leaning pallet in his hypothetical. Defendant's counsel asked, "If a warehouse employee had a leaning skid and was told to rebuild that skid, and instead of rebuilding that skid, took it upon himself to return that skid back to the freezer and take a new skid, would that be considered insubordination?" (Keyser Dep. 97:18-24.) Keyser responded, "Yes." In other words, when Keyser was presented with a hypothetical accurately reflecting the present facts, he classified Plaintiff's behavior as insubordination.

Moreover, the Rules specify that insubordination "includ[es] the failure to follow a direct order from a supervisor/manager." (Def. SOF ¶ 12.) It is undisputed that Conway ordered Plaintiff to rebuild the leaning pallet and that Plaintiff did not do so. The record supports US Foods' decision to classify Henson's conduct in the crab-leg incident as insubordination.

23

Moreover, even if US Foods did mistakenly classify Plaintiff's conduct as insubordination, Plaintiff has not adduced any evidence indicating that discriminatory animus was a factor behind such a mistake. "To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d at 765. Anthony, the union shop steward, implied that the classification may have been erroneous: When asked the reason for Plaintiff's termination, Anthony, testified that his "interpretation" was that Plaintiff "failed to follow instructions, but insubordination, I don't know." (Anthony Dep. 37:11-18.) But when he was asked whether race had an effect on Plaintiff's discipline, Anthony testified "No. No. Not here, no. Not in front of me . . . no, and I'm an African-American." (Anthony Dep. 38:25-39-2.) There is ample evidence supporting US Foods' decision to classify Plaintiff's behavior as insubordination and, even if the classification was inappropriate, there is no evidence indicating that the classification was based on discriminatory animus.

24

Plaintiff attempts to show pretext by arguing that similarly situated employees were not terminated despite conduct that was insubordinate or otherwise problematic. "[T]o be considered similarly situated, comparator employees must be similarly situated in all relevant respects . . . tak[ing] into account factors such as the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct engaged in." Wilcher, 441 F. App'x at 882 (citations omitted). In terms of the misconduct, the comparators must have "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 223 (3d Cir. 2009).

None of Plaintiff's examples are similarly situated in all relevant respects. Plaintiff cites employees whose misconduct was wholly dissimilar, including employees who were dishonest, falsified company documents, damaged company property, testified positive for controlled drug substances, or missed work days. At oral argument, Plaintiff emphasized that these comparators are appropriate because their conduct was worse than Plaintiff's conduct, but their discipline was less severe. Plaintiff has not cited any case law allowing comparators whose misconduct was wholly dissimilar. Even if the comparators were appropriate,

25

there is some distinguishing evidence. For example, the employee
who tested positive for controlled drug substances "was
reinstated after he voluntarily enrolled in a rehabilitation
program and in light of the fact that he had been with the
company for more than 15 years without any other disciplinary
action in his personnel file." (Def. Responses to Pl. Counter
SOF ¶ 49.) Furthermore, even if Plaintiff "has identified
several individuals who committed violations of either such
frequency or severity that they could have been discharged . . .
these comparators do not create a genuine issue of material
fact. [Plaintiff]'s comparator evidence does not cast doubt on
[Defendant]'s otherwise satisfactory explanation for his
termination." Opsatnik, 335 F. App'x at 224.

Plaintiff also cites examples of employees who were
insubordinate by refusing to complete work that a supervisor had
assigned to them. The insubordinate comparators are also inapt
because none of them refused to comply with an order, left an
unsafe condition, and lacked remorse. For example, Lebb
explained that one of the employees was remorseful during the
grievance process: he "realized what he had done was
inappropriate and . . . was very, very apologetic for what he
had done and then was honest of what happened so we took it into
consideration and we reinstated him." (Lebb Dep. 27:9-15.) The

26

other insubordinate comparator "came back and said I'll do the work I shouldn't of refuse it, let me have the work . . . ." (Lebb Dep. 17:9-11.) In both of these examples, therefore, US Foods management perceived that the insubordinate employee was remorseful. By contrast, Plaintiff continues to insist that his behavior was appropriate. Plaintiff's comparator evidence is inadequate to show pretext.

Plaintiff also attempts to show pretext by citing anti-FMLA and racially discriminatory comments, such as Conway's comment about African-American employees eating grape soda and chicken or Conway's reference to the FMLA as the fraudulent medical leave act. These comments do not show pretext because "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992). Conway's remarks are offensive, but a reasonable jury could not find that the comments were especially directed at Plaintiff or that they indicate that Conway planned to terminate African-American or FMLA employees more frequently.

In Moore v. U.S. Foodservice, Civ. 11-2460, 2013 WL 5476405 (D.N.J. Sept. 30, 2013), another US Foods employee, Darwin Moore, brought claims for FMLA interference and retaliation

27

PA0029

against US Foods. The Moore court examined some of the same evidence of anti-FMLA sentiment, including Moore's contentions that

> At pre-shift meetings, . . . Robert Lebb, Director of Operations, would tell the employees they were working more because of their "FMLA buddies" and encouraged employees to call those out on FMLA, to tell them to come to work. Mr. Lebb's other pejoratives included "FMLA brothers" and that "these motherfuckers on FMLA [were] the reason [employees were] working . . . overtime." Mr. Lebb specifically referred to [Defendant] needing to expend resources for overtime because employees were utilizing FMLA.

Id. at *8, n.4 (citations to Moore dep. omitted). The Moore court held that "there is no support in the record for Plaintiff's claim that Defendant terminated his employment in retaliation for taking FMLA leave. Rather, Plaintiff exceeded the number of unexcused absences allowed by his employer, . . . which ultimately resulted in Plaintiff's termination." Id. at *8. Similarly, in the present case, Plaintiff has not adduced any evidence that discriminatory or retaliatory animus motivated Defendant's decision to terminate him.

Plaintiff argues that "[a] reasonable jury can also discredit the asserted reason for termination because the Manager who made the allegation was Jack Conway." (Pl. Opp'n at 10.) Plaintiff asserts that Conway is not credible because he

28

PA0030

was terminated for dishonesty and theft and showed discriminatory animus based on Plaintiff's race and FMLA usage.

The Court finds that a reasonable jury could not find that Conway's allegations surrounding the insubordination incident were false: Plaintiff admits that he disobeyed Conway's order and continues to argue that his conduct was appropriate. The relevant facts that formed the basis of Plaintiff's termination, i.e., Plaintiff's refusal to follow a direct order and his lack of remorse, are not disputed. Likewise, Plaintiff's poor work history of multiple citations for mispicks is not disputed, none of which turns on Conway's credibility. At oral argument, Plaintiff's counsel argued that Conway was a decisionmaker in the termination process and that Conway's private meeting with Lebb indicates the possibility that Conway advocated for termination based on discriminatory animus. There is no evidence in the record regarding what Lebb and Conway discussed and the mere fact that they met does not create a disputed issue of material fact, especially when Plaintiff has admitted the facts that show insubordination.

The Court will grant summary judgment to Defendant US Foods on Plaintiff's NJLAD and FMLA unlawful retaliation claims because Plaintiff failed to establish prima facie cases of discrimination for either claim and, even if he had passed the

PA0031

prima facie threshold, he has not shown that US Foods' stated non-discriminatory reasons for the termination, i.e., insubordination and lack of remorse, were pretextual.

### C. Plaintiff's FMLA Interference Claim Fails

Section 2615(a)(1) of the FMLA makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1). "In order to assert a claim of interference, an employee must show that he was entitled to benefits under the FMLA and that his employer illegitimately prevented him from obtaining those benefits." Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 401 (3d Cir. 2007). Plaintiff has not shown that US Foods ever denied him FMLA leave to which he was entitled.

Plaintiff also argues that the termination constituted interference with his FMLA rights because he was on an intermittent FMLA leave period when the termination occurred. But "'[t]he FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA claim.'" Brown v. DB Sales, Inc., Civ. 04-1512, 2005 WL 3591533, at *11 (E.D. Pa. Dec. 29, 2005) (quoting Cohen v. Pitcairn Trust

30

Co., 2001 U.S. Dist. LEXIS 10876, at *30 (E.D. Pa. June 20, 2001)). As discussed above, US Foods had a legitimate, non-discriminatory reason for terminating Plaintiff, which has not been discredited by evidence that a reasonable factfinder could determine to be pretextual. That Plaintiff was on intermittent leave status when he was insubordinate at work by refusing to follow the repeated orders of his supervisor does not shield him from the termination decision. His refusal to follow the orders and his lack of remorse had nothing to do with his intermittent FMLA leave status.

The Court will grant summary judgment on Plaintiff's FMLA interference claim.

### D. Plaintiff's Hostile Work Environment Claim Fails

To establish an NJLAD hostile work environment claim, Plaintiff must show that "(1) the conduct complained of was unwelcome; (2) that it occurred because of the plaintiff's inclusion in a protected class under the LAD; and (3) that a reasonable person in the same protected class would consider it sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive work environment." El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 178 (App. Div. 2005). "[N]ot every offensive remark, even if direct, is actionable . . . epithets or comments

31

which are merely offensive will not establish a hostile work environment claim." Id. (citations omitted). To determine whether an environment is hostile or abusive, the Court must "look[] at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. (citations omitted). "Neither rude and uncivil behavior nor offensive comments alone create a hostile work environment under the LAD." Shaw v. FedEX Corp., A-1634-10T3, 2012 WL 3116722, at *5 (N.J. Super. Ct. App. Div. July 20, 2012).

Plaintiff's hostile work environment claim is based on (1) the comments of his supervisor Jack Conway, and (2) Plaintiff's perception that African-American employees were treated less favorably than Caucasian employees because African-Americam employees were not permitted to socialize during work hours and were targeted for mispick discipline.

Conway's comments are insufficient to establish a hostile work environment claim. Plaintiff alleges that Conway made comments during the third lunch break in which Conway joked about African-Americans' genital sizes and watching basketball, asked the employees if they were eating chicken and grape soda,

PA0034

called the lunch break the "BET lunch" in reference to Black Entertainment Television, and made comments about Conway's own African-American stepchildren listening to rap music.

Plaintiff has not alleged that these comments interfered with his work performance and, therefore, he fails to establish an essential element of a hostile work environment claim. Moreover, Plaintiff has acknowledged that the comments occurred during the third lunch break; that many of the comments stemmed from Conway's banter with another employee, who is African-American; that Plaintiff had multiple lunch break options; and that Plaintiff was not required to eat his lunch in the break room. While Conway's comments could certainly be perceived as offensive, a reasonable jury would not find that these lunchroom comments and banter created a work environment that was sufficiently severe or pervasive to alter the conditions of employment for Plaintiff as an African-American.

Plaintiff has not adduced any evidence to support his claim that African-American employees were disciplined more frequently. For example, Plaintiff testified that he "know[s]" Caucasian Selectors were disciplined less often "by them not complaining like everybody else." (Pl. Dep. 200:16-17.) But he admits this belief is based solely on perception, the speculation of other coworkers, and hearing certain names called

33

over the warehouse intercom. (Def. SOF ¶ 79.) He has "no proof" that African-Americans were written up for mispicks they did not have. (Pl. Dep. 204:10-13.) Plaintiff has not adduced competent evidence to support his claims of disparate treatment. "Perception like speculation and suspicion cannot support a cause of action." Mandel v. UBS/PaineWebber, Inc., 373 N.J. Super. 55, 79 (App. Div. 2004).

Furthermore, US Foods had various anti-harassment mechanisms, and the existence of such mechanisms can mitigate an employer's liability. The New Jersey Supreme Court has held that

> a plaintiff may show that an employer was negligent by its failure to have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms. We do not hold . . . that the presence of such mechanisms demonstrates the absence of negligence. However, the existence of effective preventative mechanisms provides some evidence of due care on the part of the employer.

Lehmann v. Toys R Us, Inc., 132 N.J. 587, 621 (1993); cf. Gaines v. Bellino, 173 N.J. 301, 320 (2002) ("A defendant is entitled to assert the existence of an effective anti-sexual harassment workplace policy as an affirmative defense to vicarious liability"). Multiple factors can show an employer's commitment to preventing a hostile work environment:

> A company that develops policies reflecting a lack of tolerance for harassment will have less concern about

34

> hostile work environment or punitive damages claims if
> its good-faith attempts include periodic publication
> to workers of the employer's anti-harassment policy;
> an effective and practical grievance process; and
> training sessions for workers, supervisors, and
> managers about how to recognize and eradicate unlawful
> harassment.

Cavuoti v. New Jersey Transit Corp., 161 N.J. 107, 121 (1999).

Evidence in the record shows that US Foods satisfied many of these factors. US Foods had an anti-discrimination policy, annual training, and remedial mechanisms for reporting complaints. It also had a toll-free Check-In Line that employees could use to anonymously report unlawful discrimination, harassment, or retaliation. (Def. SOF ¶ 4.) On his day of hire, Plaintiff signed a form acknowledging that he read and understood the Equal Opportunity Policy and agreed to "immediately report any perceived violations . . . to [his] supervisor or the Human Resources Department." (Def. SOF ¶ 5.)

US Foods cited the declaration of William Nunan, the Human Resources Manager for US Foods' Philadelphia Division to show that US Foods provides annual training on its non-discrimination, anti-harassment, and anti-retaliation policies to its employees, supervisors, and management. (Nunan Decl. ¶ 6.) Plaintiff appeared to deny this fact because "management was aware of Jack Conway's harassment / retaliation." (Pl. Response Def. SOF ¶ 2.) Plaintiff did not provide any evidence indicating

35

that US Foods did not provide these annual trainings. At oral argument, Plaintiff questioned the training but, again, did not cite to any evidence in the record. Plaintiff has not adduced any evidence indicating that the complaint mechanisms were ineffective, that complaints were ignored, that the policies were not published, or that the training sessions were inadequate or nonexistent.

Plaintiff admits that he did not use any of US Foods' anti-harassment programs and remedial measures. This failure to use the remedial mechanisms, along with the other factors discussed supra, supports granting summary judgment for US Foods. See Gibson v. State - Office of Attorney Gen., A-1426-05T2, 2007 WL 737748, at *14 (N.J. Super. Ct. App. Div. Mar. 13, 2007) ("As there is ample evidence . . . demonstrating defendants created and provided . . . avenues to address and remedy violations, and that plaintiff failed to avail herself of those available remedies . . . ., the motion judge did not err when he found that the complaint should be dismissed as a matter of law"); Ahmed v. Interstate Mgmt. Co., Civ. 11-683, 2012 WL 3038523, at *18 (D.N.J. July 25, 2012) (granting summary judgment on NJLAD hostile work environment claim because "[a]s Defendant had effective anti-harassment policies in place and responded to complaints brought to its attention, a reasonable jury could not

36

find Defendant liable on a hostile work environment claim based on allegedly discriminatory comments made by his coworkers that Plaintiff did not report").

Plaintiff argues that Barnes v. Office Depot, Inc., Civ. 08-1703, 2009 WL 4133563 (D.N.J. Nov. 24, 2009), stands for the proposition that "[w]hen a defendant contends that it had in place policies and procedures addressing anti-harassment, the Court has held that whether said policies or responses constituted a good faith effort to comply with a statute is something that is best left to the jury." (Pl. Opp'n at 23.) The Barnes court found, however, that "the record indicates unwillingness to respond to complaints submitted by the plaintiff by high level Office Depot employees" and, therefore, that "[w]hether Office Depot made a good faith effort to comply with Title VII and to respond to complaints made by Ms. Barnes is a question of fact best left to a jury." Barnes v. Office Depot, 2009 WL 4133563, at *15. In this case, there is quite plainly no evidence that plaintiff made any complaints and no evidence that US Foods was unresponsive to others' complaints.

Plaintiff cites Shepherd v. Hunterdon Developmental Center, 174 N.J. 1 (2002), in which the New Jersey Supreme Court reversed summary judgment on a hostile work environment claim, and argues that "[t]he facts here far exceed what occurred in

37

Shepherd." (Pl. Opp'n at 18.) In Shepherd, the plaintiffs had supported a lawsuit that their coworkers had brought against their supervisors. The Shepherd plaintiffs argued that, when their coworkers' lawsuit began, the supervisors "began a pattern of ill treatment and ultra-critical supervision," including statements that the supervisors "were going to watch everything that you . . . do" and that "what goes around comes around and you will be sorry for not writing better statements for us concerning the lawsuit." Id. at 9. The plaintiffs sent complaint letters to the superintendent and filed discrimination complaints with the Department of Human Services. The teachings of Shepherd are not applicable to the present case, where Plaintiff never filed any complaints regarding racial discrimination and where Plaintiff has not adduced any evidence indicating that US Foods' supervisors threatened him.

A reasonable jury could not find that Plaintiff was subject to a hostile work environment because (1) while Conway's comments were offensive, they did not impair Plaintiff's work performance, (2) Conway's comments occurred during an optional lunch break and were primarily in the context of banter with other African-American employees, (3) Plaintiff lacks competent evidence supporting his perception that African-American employees were subject to different disciplinary and deportment

38

standards, and (4) Plaintiff failed to use US Foods' anti-harassment remedial measures and has not shown that US Foods' trainings were inadequate. The Court will grant summary judgment on Plaintiff's hostile work environment claim.


**V. CONCLUSION**

The Court will grant summary judgment for Defendant on Plaintiff's claims for unlawful interference with his FMLA rights, unlawful termination in retaliation for exercising his FMLA rights, hostile work environment under the NJLAD, and unlawful termination under the NJLAD. Because summary judgment will be granted on all claims, final judgment is entered for Defendant. Because no named Defendants remain in this action, the Court will instruct the Clerk of Court to close this matter.


**November 19, 2013**      **s/ Jerome B. Simandle**
Date                JEROME B. SIMANDLE
                 Chief U.S. District Judge

PA0041